**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**HENRY CHAMBERS, JR.,**

**Plaintiff,**

**vs.**                                                    **Case No. 1:15cv56-MP/CAS**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

**Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).   It

is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner (hereinafter referred to as the Commissioner)

of the Social Security Administration (SSA) denying Plaintiff's application for a period of

disability and Disability Insurance Benefits (DIB).   After careful consideration of the

record, it is recommended that the decision of the Commissioner be affirmed.

## I.  Procedural History

On August 3, 2011, Plaintiff, Henry Chambers, Jr., filed an application for DIB

pursuant to Title II of the Social Security Act (Act).   Tr. 19, 184-85.   (Citations to the

transcript/administrative record, ECF No. 12, shall be by the symbol "Tr." followed by a

page number that appears in the lower right corner.)[1]   Plaintiff alleged disability beginning June 1, 2009, due to learning disability, major depressive disorder, asthma, high blood pressure, hepatitis C, and pre-diabetic.   Tr. 19, 61, 216, 220, 227.   For DIB purposes, Plaintiff's last date insured was September 30, 2010.   *Id.*

Plaintiff's claims were denied initially on February 15, 2012, and upon reconsideration on March 13, 2012.   Tr. 19, 76-88.   On March 30, 2012, Plaintiff requested a hearing.   Tr. 19, 89-90.   On October 8, 2013, an evidentiary, video hearing was held before Administrative Law Judge (ALJ) Robert Droker.   Tr. 35-60. Plaintiff appeared in Gainesville, Florida, and the ALJ presided over the hearing from Jacksonville, Florida.    Plaintiff was represented by Pamela C. Dunmore, an attorney. Tr. 19, 35, 91-95.   Plaintiff testified.   Tr. 19, 38-54.   Melissa T. Brooks, a vocational counselor and evaluator, testified as an impartial vocational expert.   Tr. 19, 54-59, 174-75 (Resume).   Additional evidence was submitted after the hearing.   Tr. 34, 412-431 (Exhibit 13F).

On October 29, 2013, the ALJ entered his decision concluding that Plaintiff is not disabled.   Tr. 19-30.   On September 11, 2013, Plaintiff filed a request for review of the ALJ's decision.   Tr. 13-15.   After granting Plaintiff an extension of time to submit additional information, Tr. 5-6, on January 27, 2015, the Appeals Council denied Plaintiff's request for review.   Tr. 1-4.   The ALJ's decision stands as the final decision of the Commissioner.   *See* 20 C.F.R. § 404.981.

---

[1]   Plaintiff also filed an application for Supplemental Security Income under Title XVI of the Act that was not considered.   Tr. 54-55.

On March 26, 2015, Plaintiff filed a complaint requesting judicial review of the Commissioner's final decision.   ECF No. 1.   Both parties filed memoranda of law, ECF Nos. 16 and 17, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant last met the insured status requirements of the Social Security Act on September 30, 2010."   Tr. 21.

2.  "The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 1, 2009 through his date last insured of September 30, 2010."   *Id.*

3.  "Through the date last insured, the claimant had the following severe impairments: asthma, hypertension, hepatitis C, liver disease, affective disorder, learning disorder and substance abuse."   *Id.*

4.  "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   *Id.* Plaintiff had *mild* restriction in activities of daily living; *moderate* difficulties in social functioning and with regard to concentration, persistence or pace; and had experienced *no* episodes of decompensation, which have been of extended duration.   Tr. 22-23.

5.   "[T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform medium work is defined in 20 CFR 404.1567(c) except that the claimant must avoid ladders or unprotected heights and the operation of heavy, moving machinery.   The claimant must avoid concentrated exposure to dust, fumes or gases.   The claimant can only occasionally bend, crouch, kneel, stoop or crawl.   *The claimant is limited to simple tasks performed in a low stress environment.   The claimant must avoid contact with the public and should have only limited contact with coworkers.*"[2]   Tr. 23 (emphasis added).

---

[2]   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   A Specific Vocational Preparation (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."   Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. "[SVP]

6.  "Through the date last insured, the claimant was unable to perform any past relevant work." Tr. 28.

7.  "The claimant was born on April 22, 1960 and was 50 years old, which is defined as an individual closely approaching advanced age, on the date last insured." "The claimant has a limited education and is able to communicate in English." *Id.* Plaintiff was 53 years of age on the date of the ALJ's decision. *Id.*

8.  "Through the date last insured, considering the claimant's age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that the claimant could have performed." *Id.* Based on the testimony of the vocational expert, the ALJ determined that Plaintiff could perform several representative occupations such as hospital food service worker and sandwich maker, both medium exertion, with an SVP of 2, and housekeeper cleaner, light exertion, with an SVP of 2. Tr. 29; *see supra* at n.2. The hospital food service worker, sandwich maker, and housekeeper cleaner jobs have DOT reasoning development levels of R3, R2, and R1, respectively. *See infra* at 39-46.

9.  "The claimant was not been under a disability, as defined in the Social Security Act, at any time from June 1, 2009, the alleged onset date, through September 30, 2010, the date last insured." Tr. 29.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

---

is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* Unskilled work corresponds to an SVP of one and two. Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000). Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations. SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985). In part, "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determined that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c). In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).

"Substantial evidence is more than a scintilla, but less than a preponderance.   It is such

relevant evidence as a reasonable person would accept as adequate to support a

conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations

omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The

Commissioner's factual findings are conclusive if supported by substantial evidence."

Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[3]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'"   Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

---

[3]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months.   Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.   *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).   Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim.   *See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211.

The Commissioner analyzes a claim in five steps.   20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

---

[4]   An RFC is the most a claimant can still do despite limitations.   20 C.F.R.

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.

Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.   If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

---

§ 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment"* describes an adjudicator's finding about the ability of an individual to perform work-related activities.   The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

§ 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.   Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Relevant Evidence

### 1.  Consultative Examinations and Evaluation Reports

### A.  Consultative Examination Report of Eftim Adhami, M.D.

On May 30, 2009, Plaintiff underwent a consultative examination with Eftim

Adhami, M.D.   Tr. 257-67; *see* Tr. 24.   He reported being illiterate, could not spell

usual words except for simple ones; spells only words like cat, dog, etc.; cannot write a

good letter; has depression since childhood; and had drug addiction and alcohol abuse

in the past, but is in a program for addiction treatment.   Tr. 258.   Plaintiff reported

working part-time (minor jobs) and homeless.   *Id.*   Plaintiff's reading ability was good

and his speech was normal in flow and content.   *Id.*   Plaintiff's physical examination

was relatively normal including normal range of motion.   Tr. 258, 260-62.   Plaintiff's

mental status was normal in mood, judgment, and expression, and he understood

questions and answered appropriately.   Tr. 258.

Dr. Adhami noted that Plaintiff reported being "kicked out of 10th grade because

he cut somebody with a knife" and he diagnosed Plaintiff with a "decreased ability in

writing and reading/spelling, even though he went up to 10th grade."   *Id.*   Dr. Adhami

noted that "a mental evaluation can reveal details."   *Id.*   Dr. Adhami's conclusions

related to physical issues, not mental.   TR. 259.

B. **Consultative Evaluation Report of William E. Beaty, Ph.D.**

On June 3, 2009, Plaintiff underwent a one-time consultative psychological examination with William E. Beaty, Ph.D.   Tr. 269-71; *see* Tr. 24-25.   Plaintiff appeared clean and appropriately dressed and there were no obvious physical appearances of being handicapped, no involuntary movements, and he walked with a normal gait.   Tr. 269.   Plaintiff reported being homeless off and on since 2000 and currently staying with a friend.   He reported being married briefly and has a daughter who he does not see.   *Id.*   Plaintiff described his education, including being kicked out of 10th grade "after an incident of 'horse play' in which he pulled a knife."   *Id.*   Plaintiff reported that he had problems with math and reading, but was not in ESE classes.

Dr. Beaty described Plaintiff's mood as depressed with sober demeanor.   He had a "rather flat presentation of self," maintained good eye contact, and was responsive to questions.   He talked of his situation as being hopeless.   Tr. 270. Dr. Beaty reported that Plaintiff "appears to be significantly depressed" and he had "some anxiety features associated with this."   Tr. 271.   He attended the Job Corp in 1978 for 11 months getting out 1979.   "[H]e did not do well academically.   He studied clerical arts-office work and culinary arts.   He left when he was kicked out for roughhousing in the dorm.   In 1980, he attended Job Corp again for 8-10 months in another city, again studying culinary arts.   He was also kicked out of that program." Tr. 269.

Plaintiff described work after leaving high school.   Tr. 269-70.   Plaintiff reported being diagnosed with high blood pressure for which he was prescribed medication and

that he was diagnosed with hepatitis C in 2007.   Tr. 270.   He reported a history of drug

use beginning in 1986.   *Id.*   He also reported being arrested several times for having

drug paraphernalia, twice for possession of crack cocaine, and other times for intent to

use, open container, and trespassing.   *Id.*

Plaintiff denied ever having any mental health evaluation or therapy or being

prescribed any psychotropic medication.   Tr. 270.   He reported being depressed as a

child and he was raised by his grandmother until age three and then his mother took

him.   He lived an erratic life, frequently living on the streets.   *Id.*

Plaintiff reporting his daily activities including arising at five a.m., reading the

Bible, having breakfast prepared by others, helping with cleaning around the house,

doing yard work and taking a nap.   He has launch and continues working around the

house or in the yard.   He has dinner, reads the Bible, watches television or a movie,

and goes to bed around 11 p.m. to 1 a.m. and sleeps without interruption.   *Id.*

Plaintiff's mental status included depressed mood and sober demeanor;

constricted, flat affect.   *Id.*   His orientation was okay as to person, place, time, date,

reason for coming to the evaluation, previous and current Presidents and his speech

was normal.   His thought process was intact and he exhibited no delusions or paranoia

and his content was appropriate to his conversation.   *Id.*   No attention impairments

were noted; he was able to count backward 20-1 x 1s and recite the alphabet, although

both tasks were done slowly and deliberately.   *Id.*   Regarding cognition, Plaintiff was

"responsive verbally, alert.   Estimated average level cognitive ability; gave good

interoperations to two proverbs."   *Id.*   Regarding memory impairment, none were noted

regarding history, although he recalled 0/3 words after five minutes and stated he had problems remembering what day it was, messages he was asked to pass on, phone numbers, and other unstated issues. *Id.* Plaintiff did not report a history of hallucinations and perceptual disturbances and none were observed. No judgment impairment was noted. Regarding interaction, it is noted that he had a "rather flat presentation of self, good eye contact, responsive to questions, cooperative, talks of his situation being 'hopeless.'" *Id.*

Dr. Beaty provided a summary:

> The client appears to be significantly depressed. He has some anxiety features associated with this. He is not a good risk to maintain his sobriety given his history. There were no test scores or corroboration to validate his statement about having a learning disability, so that was not diagnosed.

Tr. 271.

Dr. Beaty diagnosed Plaintiff with "Major Depressive Disorder, single episode, moderate; Cocaine, Alcohol, and Cannabis abuse, all in remission." *Id.* As for Axis IV, Dr. Beaty noted: "problems in education, occupation, access to health services, primary support group, housing, economic, interaction with the legal system." *Id.* Dr. Beaty noted that Plaintiff was able to manage his own funds. *Id.* His prognosis was "poor." Dr. Beaty summarized Plaintiff's ability to do work-related tasks.

> [N]o problems with sitting, standing, walking, lifting or carrying except he says he cannot exert himself too much for fear of starting an asthma attack. His hearing and speaking are ok, he has no problems traveling. He said he understands most direction [sic], instructions and conversations, but has problems remembering phone numbers and messages, and when he worked had trouble remembering the directions and instructions for his job. He indicated his sustained concentration and task persistence was adequate. His social interactions are very limited, "people are too loud and talk too much" and he felt that "people tend to be at odds with me". He is not very socially adaptable.

*Id.*

### C. Dr. Beaty's Mental Residual Functional Capacity Assessment

On March 4, 2013, at the request of Plaintiff's counsel, Dr. Beaty was asked to complete a Mental Residual Functional Capacity Assessment.   Tr. 368-70.   Dr. Beaty opined that *as of his prior evaluation on June 3, 2009*, Plaintiff was markedly limited in his ability to: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of reset periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; or set realistic goals or make plans independently of others.   Other than referring to his prior evaluation of June 3, 2009, Dr. Beaty did not provided any explanations for his assessment. Tr. 368-70.   Dr. Beaty did not re-examine Plaintiff.

### D. Dr. Beaty's Follow-up Statement

On June 11, 2013, Plaintiff's counsel inquired of Dr. Beaty as to Plaintiff's non-exertional limitations and precisely "if his polysubstance abuse was a material factor in [his] assessment of [Plaintiff's] Mental Residual Functional Capacity." R. 401. Dr. Beaty placed an "X" over a box stating: "Polysubstance abuse was not a material factor of function in my assessment of [Plaintiff's] mental residual functional capacity." *Id.*; *see* Tr. 25.

### 2. Medical Examinations and Treatment

In June 2009, Plaintiff reported to Helping Hand Clinic that he had asthma which was exacerbated by heat. Tr. 388. He was prescribed an inhaler for his symptoms. He expressed at this time that he was disabled in part because he was illiterate. *Id.* Treatment notes from Plaintiff's primary care physician reflect that his blood pressure was elevated, but improving on medication and was within normal limits during his December 2009 appointment. Tr. 390. By August 2010, however, his blood pressure was again elevated.

In and around January 2011, Plaintiff was diagnosed (at a clinical visit) with hepatitis c virus. Tr. 275, 287, 289. Plaintiff had been in jail two weeks prior and stated he had been diagnosed with hepatitis c virus. (He had been referred orally to Shands Charity Clinic for hepatitis C. R. 275-76. ) At the time of examination, he had jaundiced eyes, hepatomegaly, lumbar tenderness, spasm and limited range of motion. Tr. 275. He was referred to a liver clinic for charity care follow-up.[5]

---

[5] On February 7, 2012, a report from Digestive Disease Associates provided a

On January 21, 2011, Plaintiff had a psychiatric evaluation by a medical doctor and a medication management meeting at Meridian Behavioral Healthcare, Inc. (MBHC).[6]  Tr. 331-37; *see* Tr. 26-27 (ALJ's consideration of evaluation and treatment notes from MBHC).   Plaintiff reported a long history of drug and alcohol use and no primary psych diagnosis and never on any medications.   The mental status examination reveals that Plaintiff's appearance was fair; manner, appropriate; motor behavior and speech were normal; mood was okay; he had full range of affect; his thought process was organized; he denied homicidal and suicidal ideation; and his

---

review of systems and noted, in part, for "psychiatric," "not present-anxiety and depression," although it is noted earlier in the patient notes that "[h]e has been suffering with depression and previous illicit drugs."   Tr. 394-95.   On February 28, 2012, an abdominal ultrasound was performed which showed a 16 mm gallstone, but normal kidneys, bile duct and no evidence of acute cholecystitis.   Tr. 397.   A colonoscopy performed revealed nonbleeding internal hemorrhoids.   Tr. 404-05.   Plaintiff presented for care in March 2012 complaining of hepatitis C symptoms and assessed as chronic hepatitis, viral C.   Tr. 392-93.   It is reported that Plaintiff was on medication for depression, "but is doing well by his estimation."   Tr. 392.

[6]   It appears Plaintiff was admitted to MBHC's forensics program and began receiving services from Forensic Specialist Nathaniel Lopez on December 10, 2010, while Plaintiff was in jail.   Tr. 342; *but see* (Tr. 304-participation in forensics program since Jan. 2011).   On or about March 9, 2012, Aaron Whitely, B.S., completed a discharge/transfer summary providing a detailed summary of Plaintiff's treatment and discharge on February 29, 2012.   Tr. 342-43.   This summary noted that Plaintiff had been prescribed Celexa 40mg, but no longer "taking any medication and in good health at" his last group attended.   Tr. 342.   Mr. Whitley opined that Plaintiff's mental health prognosis was "poor."   The current diagnoses were major depression, recurrent and polysubstance dependence.   Tr. 343.   Psychosocial and environmental problems included homeless (living in a house through charity right now), unemployed, and no family support.   *Id.*   His current Global Assessment of Functioning (GAF) score was 55 and 40 upon admission.   *Id.*; *see infra* at n.7.   It was also noted that Plaintiff had an interview to be scheduled for the HOPE program and that should his symptoms recur, he could go through the access center or the CSU, if a severe depressive episode was happening.   *Id.*

insight and judgment were fair.   He was positive for mood swings; his last drink was in

October 2010; and he had no significant neuronegative (sp) symptoms.   Tr. 333, 335.

Diagnoses included etoh (ethyl alcohol), cocaine, and depression, not otherwise

specified and learning disability.   Tr. 336.   He was homeless and had no support.   *Id.*

His current GAF score was 65.[7]   He was prescribed Lenexa. *Id.*

---

[7]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.*   *See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."   DSM-IV-TR at 34.   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   *Id.*   A GAF scale rating of 61 to 70 indicates some *mild* symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.   *Id.*   The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (*see* the chapter "Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

Plaintiff had follow-up visits (for medication management) at MBHC on March 14, 2011, April 29, 2011, June 10, 2011, July 15, 2011, August 29, 2011, September, 26, 2011, October 24, 2011, and December 5, 2011.   Tr. 315-30.

On March 14, 2011, Plaintiff's progress (for medication management) is noted between eight and nine with ten being good.   His objective assessment is relatively normal.   Plaintiff reported: "I'm doing ok," although he was hearing voices off and on, but he was better than before when he was doing drugs.   Tr. 330.

On March 28, 2011, Plaintiff underwent a Global Appraisal of Individual Needs (GAIN) evaluation at MBHC with Nathaniel Lopez, B.S.   Tr. 310-14; *see* Tr. 304-08. Plaintiff provided a history for Mr. Lopez and reported, in part, participating in rehabilitation for a history of drug use.   Historical diagnoses included clinical disorder/focal conditions; major depressive disorder, single episode, unspecified; cocaine and alcohol dependence and a GAF score of 58.   Tr. 310.   He was prescribed Celexa.   Tr. 297.   He reported that he was voluntarily living in a group home. Tr. 304.

On April 29, 2011, appeared for a medication management meeting at MBHC and the results of the objective assessment were generally normal, including that his mood was better, he had full range of affect, and is thought process was organized.   Tr. 328.   There were no safety concerns, his sleep and appetite were fair, and he continued on Celexa.   The diagnosis was depression, not otherwise specified.   *Id.*

On June 10, 2011, was noted during a medication management meeting at MBHC he was doing good in terms of stability and away from drugs and maintaining

sobriety, but he was not feeling well – "a loser."   Tr. 325-26.   He had financial

concerns/ burdens, "hopeless feeling".   Tr. 326.   Plaintiff was continued on Celexa.

The diagnoses were depression and etoh/cocaine dependency although his progress

was between eight and nine, with ten being good.   *Id.*

On July 15, 2011, during another medication management meeting at MBHC,

Plaintiff reported being on his medications as prescribed with no side effects, although

he was sleeping too much – he did not want to get up in the morning.   Plaintiff was

applying for SSI.   Tr. 323.   Plaintiff's objective assessment was relatively normal

except for a constricted, dysphoric affect.   Tr. 324.   His diagnoses remained

depression, etoh/cocaine.   *Id.*   He remained on Celexa; there were no safety concerns

noted.   He lived in outreach housing from the church.   He was staying clean and

sober.   *Id.*

During an August 29, 2011, medication management meeting at MBHC, Plaintiff

reported that he cannot spell right which stressed him out a lot when doing paperwork.

He was applying for disability and Medicaid so he could get coverage for hepatitis C

treatment.   Tr. 321.   The objective assessment was relatively normal with the

diagnoses including etoh/cocaine history, psychosis (subconscious things), not

otherwise specified, and learning disability.   Tr. 322.   He reported stating that he "got a

nerve problem and just not stable."   *Id.*   His sleep and appetite are good; he was going

to church and reading the Bible; there were no side effects concerns; no suicidal or

homicidal ideation or paranoia.   He was continued on Celexa.   He was maintaining

daily structure and trying to get things done.   *Id.*

On September 14, 2011, Plaintiff established care with University of Florida Physicians and reported an "extensive history of homelessness, drug/etoh, jailtime." Tr. 421. Plaintiff reported feeling good and "clean of drugs and etoh" and that his hypertension had been well-controlled over that time. *Id.* He reported being set up for "meds/counseling" at Meridian for depression. "Other than that, he reported feeling "great" and just wants "to get into the system before [his] Medicaid runs out." *Id.* Under "psychiatric/behavioral," Plaintiff was positive for dysphoric mood; negative for suicidal ideas and self-injury. Plaintiff was "nervous/anxious." *Id.* Another "psychiatric" note under "physical exam" stated that Plaintiff had normal mood and affect; his behavior was normal; and judgment and thought content was normal. Tr. 422.

On September 28, 2011, compliance problems were noted to include exercise, diet, and psychosocial issues. Hypertension is reported as a chronic problem. He was positive for malaise/fatigue, chest pain, and headaches, but negative for other systems. Tr. 417. On October 27, 2011, he was diagnosed (by University of Florida Physicians) with uncontrolled hypertension, although all other systems were negative after review. Tr. 412. In part, Plaintiff was alert and oriented to person, place, and time; he had a normal mood and affect; and his behavior, judgment and thought content were normal. Tr. 413.

On September 26, 2011, during a medication management meeting at MBHC, Plaintiff reported no side effects from medications; loved going to church and

anticipated going there and going to the library to learn spelling.   Tr. 319.   The

objective assessment was generally normal and he was temporarily on Medicaid.

Tr. 320.   Diagnoses included depression, "in full remission." A history of cocaine and

Etoh use and hepatitis C, and learning disability (comprehension, reading, and writing

and words).   His progress is noted at eight out of ten.   *Id.*   There were no safety

concerns. He was taken his medications as prescribed.   *Id.*

During a follow-up appointment on October 24, 2011, for medication

management at MBHC, Plaintiff reported he was compliant with his medication regimen,

had no desire to use drugs, and was going to church.   He had been doing well for the

past six weeks and his class at MBHC was going good.   His objective assessment was

generally good.   It is reported that Plaintiff was involved in a literacy program at the

local library for learning, spelling, writing, and reading.   There were no safety concerns.

Diagnoses including learning, depression and history of etoh/cocaine use.   He was

continued on Celexa.   Tr. 298, 316-17.

On December 5, 2011, during a medication management meeting at MBHC,

Plaintiff advised that his disability claim was denied and that he was seeking a second

appeal.   Tr. 315.   The objective assessment results were generally normal with

diagnoses of learning disability and history of etoh/cocaine use.   Tr. 316.   Plaintiff was

taking his medications as prescribed with no side effects; his sleep, appetite, and

energy were good.   He was continued on Celexa.   *Id.*

On February 2, 2012, an outpatient progress note (for medication management)

noted that Plaintiff was out of the forensic program; had no place to live; was applying

for disability; getting on Medicaid temporarily; medications were covered; went to church and the library; taking Celexa; and taking medications as prescribed with no side effects. The objective assessment was relatively normal and a diagnosis was learning with a history of etoh and cocaine. His progress was noted at approximately seven on a ten point scale with ten being good. Tr. 350.

On May 7, 2012, Plaintiff met with Melanie Mann, BS/COIII, from MBHC. Tr. 344-46. In part, Plaintiff reported he missed no appointments in six months; was compliant with medication and stable when on medication and reported no side effects; no drug/etoh use and some tobacco use; no suicidal or homicidal ideations; and depression. Tr. 344. The diagnosis was learning disorder, not otherwise specified, with a current GAF score of 55. *Id.* Transition criteria included that "[u]nless otherwise advised, in order to keep progressing towards a stable transition to his Primary Care Physician or the Community, [Plaintiff] will continue services to cope with depression." *Id.* A May 7, 2012, outpatient progress note from MBHC (for medication management) noted in part that Plaintiff still heard voices but not loud; he was not on drugs for two years; sleeping well; no relapse since he was taking medication; and good concentration. Tr. 347-48. The objective assessment was relatively normal. He was prescribed Abilify as a new prescription. Tr. 348.

As of June 8, 2012, Plaintiff reported to Shumin Zhang, M.D., of MBHC's outpatient program (for medication management) that he relapsed on crack cocaine and drank three to four cans of beer two weeks prior. Tr. 352. Abilify was discontinued and Plaintiff was continued on Celexa. *Id.*

As of an August 28, 2012, medication management meeting at MHBC's outpatient program, Plaintiff reported to Dr. Zhang that he was homeless; trying to get into HOPE; and that he was taking Celexa.   He was referred to group therapy. Tr. 354.   He had been arrested for trespassing; relapsed on etoh and cocaine for two months; and in jail for one month.   Otherwise, the objective assessment was relatively normal.   *Id.*

On October 22, 2012, Plaintiff had a medication management meeting at MBHC with Linda Skalsky, M.S.N., A.R.N.P, A.N.C.C.   Tr. 360-61.   The notes are difficult to read, but state that he had been using (substances) up until one month prior; was homeless, but living with a lady who helps the homeless; poor hygiene; compliant with Celexa; feeling stress; attending a rehabilitation program; and trying to get disability. Tr. 361.   His objective assessment was relatively normal although he was feeling stressed and hears voices, but his insight and judgment were good.   *Id.*   His target symptoms were anxiety and depression.   *Id.*   He was taking Celexa and Seroquel was added.   *Id.*

On October 23, 2012, a psychosocial evaluation (difficult to read) and a substance abuse addendum were completed at MBHC.   Tr. 364-67.   The substance abuse addendum noted that Plaintiff reported spending too much money on drugs and alcohol.   Tr. 367.   He last used alcohol, cocaine, and marijuana/hash in September 2012.   Tr. 366.   He perceived that he was an addict and that he needed to stop. Tr. 367.

On January 29, 2013, Plaintiff had another medication management meeting with Jeannie Short, M.S.N., A.R.N.P., Clinical, with MBHC who noted Plaintiff reported being "cut–off" from Medicaid, which he learned about the prior day and was getting his medications through the forensic program until May 1, 2011, when he received Medicaid.   It is further reported that Plaintiff was anxious, had a sense of dread, and had a sleep disturbance, excessive worry, and restlessness.   His medications, Celexa and Seroquel, had been working well.   His mood was anxious and affect congruent with mood although "concerned" is noted.   It is noted that he heard voices and also sometimes saw snakes, otherwise his objective assessment was relatively normal.   His GAF score was 53 and there was no change to his medications, which included Celexa and Seroquel, although he could not afford medications.   He was given a prescription in case he could receive help.   Tr. 363.

Plaintiff received medical assistance from the Helping Hands Clinic from approximately April 2007 through March 2013.   Tr. 375-91.   In January 2013, Plaintiff requested refills of several medications and it was noted that he was to be seen at MBHC on January 29, 2013, for medication for depression and anxiety (based on his current living situation), but he had not reported suicidal or homicidal ideation.   Tr. 378. On March 4, 2013, Plaintiff requested refills for medication(s) and it was noted that overall he was doing well, his blood pressure was well controlled, and he offered no new complaints.   Tr. 377.   This latter note appears to be the last record of his examination and treatment.   *See* Tr. 23-28, 33-34.

### 3. Plaintiff's Hearing Testimony

The ALJ considered Plaintiff's hearing testimony at step three, and at step four

when assessing Plaintiff's RFC.

> In activities of daily living, the claimant had mild restriction.   The claimant
> testified that he is able to perform household chores such as doing yard work,
> preparing simple meals, washing dishes, vacuuming, sweeping, mopping,
> making his bed and taking out the trash.   The claimant testified that he is able
> to use public transportation and perform self-care such as bathing and
> dressing.   The performance of these tasks demonstrates that he only has mild
> limitations in activities of daily living.
>
> In social functioning, the claimant had moderate difficulties.   The claimant
> testified that he attends church.   He also testified that he spends time visiting
> family and friends.   He is able to communicate with medical personnel.   These
> relationships demonstrate in part, that his limitations in social functioning are
> only moderate.
>
> With regard to concentration, persistence or pace, the claimant had moderate
> difficulties.   The claimant testified that he spends time during the day reading
> the Bible and watching television.   Giving the claimant the benefit,
> considering the overall evidence, the undersigned finds that the claimant has
> moderate difficulties in this area.

Tr. 22 (step three).

> The claimant has alleged that he is unable to work due to limitations from
> asthma, hypertension, hepatitis C, liver disease, affective disorder, learning
> disorder and substance abuse; however, the medical evidence of record does
> not support these allegations.   The claimant testified that he left his last job in
> 2009 and has not sought other work since.   The claimant testified that he
> experiences limiting mental symptoms, including auditory hallucinations,
> impaired attention, low energy and paranoid thoughts.   The claimant testified
> that his mental health symptoms limit his ability to concentrate and persist at
> work.   The claimant testified that he has a history of drug use and learning
> disabilities.   He testified that he completed a drug rehabilitation program at
> Meridian Behavioral Health Care.   He also testified that he has difficulty writing
> and reading complex material.   The claimant testified that he is prescribed
> medication for his symptoms.   He testified that his medications help control his
> symptoms, but also cause memory loss.   Despite limitations from his
> impairments, the claimant testified that he is able to perform household chores

such as doing yard work, preparing simple meals, washing dishes, vacuuming, sweeping, mopping, making his bed and taking out the trash. The claimant testified that he is able to use public transportation and perform self-care such as bathing and dressing. The claimant testified that he spends time during the day reading the Bible, watching television, attending church, and visiting family and friends.

\* \* \*

The severity of the symptoms and the alleged effect on function is not entirely consistent with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alternations of usual behavior or habits. The claimant testified that he is able to perform household chores such as doing yard work, preparing simple meals, washing dishes, vacuuming, sweeping, mopping, making his bed and taking out the trash. The claimant testified that he is able to use public transportation and perform self-care such as bathing and dressing. The claimant testified that he spends time during the day reading the Bible, watching television, attending church, and visiting family and friends. Such a description of the claimant's daily activities and capacity for social functioning suggest a greater capacity that [sic] that alleged by the claimant during his hearing testimony and that would preclude all sustained work activity.

Tr. 24-27 (step four); *see* Tr. 38-54 (transcript of hearing testimony). The ALJ made

further findings regarding inconsistencies in the record.

In addition to the inconsistency between the claimant's allegations and his activities as described in the previous paragraphs, the medical evidence does not support the severity of the claimant's symptoms or limitations as alleged. The office visit notes reflect numerous occasions on which the claimant did not did not specify any particular complaint, which contrasts with the current claim of ongoing, disabling symptoms since the alleged onset date. Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature. There is no indication the claimant has required any emergency room treatment or inpatient hospitalization for any mental health problem. The medical evidence of record reflects minimal objective findings of disabling limitations, and no history of surgery or injections for relief of any of the alleged conditions. Treatment notes reflect a good to moderate response when the claimant is compliant with medication and treatment recommendations (Ex. 7F). The claimant has reported a good range of daily activities. In January 2012, the claimant completed a health form and reported that he was able to walk 20 hours in a week (Ex. 12F/1).

Tr. 27.

### 4. Vocational Expert's Hearing Testimony

The vocational expert heard Plaintiff's testimony regarding his past relevant work and identified the exertion and skill level of each job Plaintiff performed in the last 15 years. Tr. 55. These jobs included commercial cleaner, heavy exertion and unskilled with an SVP of 2; construction worker II, very heavy exertion and unskilled with an SVP of 2; lumber handler, heavy exertion and unskilled with an SVP of 2; and garbage collector, very heavy exertion and unskilled with an SVP of 1. Tr. 56; *see* Tr. 28. The ALJ asked the vocational expert to assume the following facts:

> Assume I find that the claimant is 53 years old, has a 9th grade education. Assume further I find that he could perform medium work but is further limited by the following exertional and non-exertional impairments. Needs to avoid ladders or unprotected heights, needs to avoid the operation of heavy moving machinery, needs to avoid concentrated dust, fumes and gases, needs low stress word [sic] environment with no production line and he needs simple tasks, needs to avoid contact with the public and limited contact with co-workers. By that I mean needs to be able to perform his task by himself without the need to assist from other co-workers with [INAUDIBLE]. He can occasionally bend, crouch, kneel, stoop, squat. Can the claimant perform any of his past jobs?

Tr. 56. The vocational expert responded "[n]o." *Id.*; *see* Tr. 28.

The ALJ asked the vocational expert another hypothetical question followed by a colloquy.

> Q Let's go down to entry level, and assume the claimant has most skills, assuming skills at all and that he is the age I previously described, has the work experience, education previously said and assume further that he can perform medium work and has the exertional and non-exertional limitations I have described. Are there any entry-level jobs the claimant could perform, and if so, would you give us the title of the job, number of jobs in the region, which is only in the state of Florida? There some non-included light level jobs. Describe those as well.
>
> A Yes, your honor. There are some titles that can be performed in the hypothetical. The first one is hospital food service worker. DOT number 319.

677-014.   It is medium, SVP 2, unskilled.   In the state of Florida, 1,663 positions exist.   In the national economy, 38,295 positions exist.   The next one is sandwich maker.   DOT number 317.664-010.[8]   It is medium, SVP 2, unskilled. In the state of Florida, 3,318 positions exist.   In the national economy, 49,095 positions exist.   The next one is housekeeping cleaner.   DOT number 323. 687- 014.   It is light, SVP 2, unskilled.   In the state of Florida, 10,492 positions exist. In the national economy, 133,887 positions exist.

Q What type of breaks would be allowed assuming in this level of competitive employment?

A Typically a 15-minute break is scheduled for the morning, again in the afternoon and then a lunch break for 30 minutes to an hour.

Q What number of unscheduled absences would be tolerated and still maintain this level of competitiveness?

A Many employers allow 10 unscheduled absences per year.

Q Is your testimony consistent with the DOT?

A Yes, your honor.

Tr. 57-58; *see* Tr. 28-29.   Plaintiff's counsel engaged in the following colloquy with the

vocational expert.

Q Ms. Brooks if we added to that hypothetical the person will have a marketability in maintain attention and concentration for extended periods, with that change your testimony at all?

A Yeah.   That would eliminate these job titles.

Q And as to the first hypothetical, if we change that just a bit to state that the person would need supervision from co-workers, with that change your testimony at all?

A What do you mean would need supervision?

Q I apologize.   Would having marked ability in maintaining the routine job without supervision.   They would need supervision in order to be able to maintain the position?

---

  [8]   The ALJ incorrectly referred to this DOT number as 317.640-010.   Tr. 29.

A If there's a sincere loss of the ability to sustain an ordinary routine without special supervision?

Q Yes.

A Then that fails to meet one of the basic mental exams we do for unskilled work.

Tr. 58-59.   Plaintiff's counsel advised the ALJ that her hypothetical facts or restrictions were added to the hypothetical based on Dr. Beaty's mental RFC assessment, Tr. 368-70.   Counsel further advised the ALJ that they had followed-up with Dr. Beaty and inquired whether drugs or alcohol any influence on his earlier assessment.[9]   Tr. 59.

## V.  Legal Analysis

**Substantial evidence supports the ALJ's determination that Plaintiff is not disabled.**

Plaintiff raises two issues for the Court's consideration: 1) whether the ALJ's reasons for rejecting the opinion of Dr. Beaty are based on substantial evidence, and 2) whether the ALJ erred when he relied on the vocational expert witness's testimony, which, according to Plaintiff, conflicted with the DOT and selected characteristics of occupations defined in the DOT?   ECF No 16 at 1.

1.

On June 3, 2009, Plaintiff underwent a one-time consultative psychological examination conducted by Dr. Beaty.[10]   Tr. 269-71.   Dr. Beaty's evaluation results are

---

[9]   As discussed herein, the *supra* at 9, on June 3, 2009, Dr. Beaty performed a consulting, psychological examination of Plaintiff.   Tr. 268-71.   On March 4, 2013, Dr. Beaty completed a mental RFC assessment at the request of Plaintiff's counsel. Tr. 368-70.   Also at the request of Plaintiff's counsel, on June 11, 2013, Dr. Beaty advised that "[p]olysubstance abuse was not a material factor of function in [his] assessment of [Plaintiff's] mental [RFC]."   Tr. 401.

summarized herein.  *See supra* at 9-11.  Dr. Beaty diagnosed Plaintiff with "Major

Depressive Disorder, single episode, moderate," and cocaine, alcohol, and cannabis

abuse.  Tr. 271.  He also indicated that Plaintiff was not a good risk to maintain his

sobriety given his history.  *Id.*  The ALJ noted that Dr. Beaty stated Plaintiff "reported

some problems with reading and writing, but no history of special education problems"

and that Plaintiff "was competent to manage his finances, with some problems

remembering work-related details and a limited ability to sustain social interaction and to

be socially adaptable."  Tr. 24-25.[11]  Dr. Beaty's evaluation occurred before most, if not

all, of the medical evidence of record.  *See* Tr. 24-28.

The ALJ considered Dr. Beaty's June 3, 2009 evaluation, noting his salient

findings, and also considered his subsequent opinion of June 11, 2013, that Plaintiff's

"[p]olysubstance abuse was not a material factor of function in [his] assessment of the

[Plaintiff's] mental [RFC]."  Tr. 24-25.  The ALJ mentioned Dr. Beaty's March 4, 2013,

mental RFC assessment, Tr. 368-70, when giving "little weight" to his opinion.  Tr. 27[12]

---

[10]  It appears this examination was conducted with a prior disability application
filed by Plaintiff that was denied on October 29, 2009.  Tr. 62, 216.

[11]  Regarding Plaintiff's ability to do work-related tasks, Dr. Beaty opined: "[H]e
said he understands most direction [sic], instructions and conversations, but has
problems remembering phone numbers and messages, and when he worked had
trouble remembering the directions and instructions for his job.  He indicated his
sustained concentration and task persistence was adequate.  His social interactions
are very limited, "people are too loud and talk too much" and he felt that "people tend to
be at odds with me".  He is not very socially adaptable."  Tr. 271.

[12]  In March 2013, almost four years after his initial evaluation, when contacted
by Plaintiff's counsel, Dr. Beaty completed a mental RFC assessment that indicated *as
of his June 2009 evaluation, and without referring to any medical records compiled
thereafter*, that Plaintiff had marked limitations in 14 out of 20 areas.  Tr. 368-70.

Prior to providing his rationale for giving Dr. Beaty's June 3, 2009, opinion "little

weight," the ALJ summarized the medical and other evidence, including but not limited

to Plaintiff's testimony and subjective complaints.   Tr. 22-27.   The ALJ also considered

Plaintiff's reported symptoms and his reported effects on his limited function and noted:

> After careful consideration of the evidence, the undersigned finds
> that the claimant's medically determinable impairments could reasonably
> be expected to cause the alleged symptoms; however, the claimant's
> statements concerning the intensity, persistence and limiting effects of
> these symptoms are not entirely credible for the reasons explained in this
> decision.
>
> The severity of the symptoms and the alleged effect on function is not entirely
> consistent with the total medical and nonmedical evidence, including
> statements by the claimant and others, observations regarding activities of
> daily living, and alternations of usual behavior or habits.   The claimant
> testified that he is able to perform household chores such as doing yard work,
> preparing simple meals, washing dishes, vacuuming, sweeping, mopping,
> making his bed and taking out the trash.     The claimant testified that he is
> able to use public transportation and perform self-care such as bathing and
> dressing.     The claimant testified that he spends time during the day
> reading the Bible, watching television, attending church, and visiting family
> and friends.     Such a description of the claimant's daily activities and
> capacity for social functioning suggest a greater capacity that alleged by the
> claimant during his hearing testimony and that would preclude all sustained
> work activity.

Tr. 26-27.   The ALJ considered Plaintiff's work history in assessing his credibility and

noted:

> Under 20 CFR 404.1529 and 416.929 as well as Social Security Ruling
> 96-7p, the undersigned must also consider the claimant's work history in
> assessing his credibility.   The claimant worked only sporadically prior to
> the alleged disability onset date, which raises a question as to whether the
> claimant's continuing unemployment is actually due to medical impairments.
> The undersigned finds that the claimant's sporadic work history does not
> lend great support to the credibility of his statements about his ability to work
> because of pain and other subjective complaints.

Tr. 27.  Next, the ALJ considered whether the medical evidence supported the severity

of Plaintiff's symptoms and limitations and noted:

> In addition to the inconsistency between the claimant's allegations and his activities as described in the previous paragraphs, the medical evidence does not support the severity of the claimant's symptoms or limitations as alleged. The office visit notes reflect numerous occasions on which the claimant did not did not specify any particular complaint, which contrasts with the current claim of ongoing, disabling symptoms since the alleged onset date.  Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature.  There is no indication the claimant has required any emergency room treatment or inpatient hospitalization for any mental health problem.  The medical evidence of record reflects minimal objective findings of disabling limitations, and no history of surgery or injections for relief of any of the alleged conditions.  Treatment notes reflect a good to moderate response when the claimant is compliant with medication and treatment recommendations (Ex. 7F).  The claimant has reported a good range of daily activities.  In January 2012, the claimant completed a health form and reported that he was able to walk 20 hours in a week (Ex. 12F/1).

Tr. 27.  Regarding Dr. Beaty's opinion, the ALJ concluded:

> Little weight is given to the opinion of Dr. Beatty [sic], who performed a psychological evaluation of the claimant in 2009 (Ex. 2F).  Dr. Beatty examined the claimant on one occasion.  Dr. Beatty's assessment was based primarily on the claimant's report of subjective symptoms, which, for reasons stated in detail above, are not reliable.  The subsequent residual functional capacity statement and polysubstance abuse statement prepared by Dr. Beatty were based only this one-time evaluation.  The opinions of Dr. Beatty are inconsistent with the medical evidence of record, particularly the opinions of the claimant's treatment providers at Meridian Behavioral Health Care.[13]  Dr. Beatty's opinions are also inconsistent with the claimant's own

---

[13]  Plaintiff states in his memorandum that "[t]his is simply untrue.  The medical records from [MBHC] also document that [Plaintiff] was diagnosed with Major Depression, Recurrent and reference his severe depression.  Tr. 295-337; 342-367." ECF No. 16 at 9 n.4.  These diagnoses appear in the MBHC records.  The diagnoses alone do not establish Plaintiff's disability and inability to work.  Plaintiff cites to selective references in the examination and treatment notes from MBHC from March 2011 to October 2012 that tend to support Dr. Beaty's opinion.  However, there are many references in the examination and treatment notes from MBHC and other providers and other observations made by the ALJ, including but limited to his credibility

statements that he is able to use the bus and perform a good range of daily activities.

Tr. 27.[14]   The ALJ gave "[g]reater weight" to Plaintiff's "treatment providers at [MBHC], who saw [Plaintiff] over a period of many months" and stated: "These providers assigned a range of GAF scores in the 50-55 range, indicating only moderate symptoms and limitations in functioning.   These providers also opined that the claimant had a good response to his medication and his symptoms were well controlled with medication (Ex. 7F/1)."   Tr. 27.

At the conclusion of his RFC assessment, the ALJ provided a summary of his findings after considering the record "in its entirety."   Tr. 28.

> When the record is considered in its entirety, though the claimant may have some discomfort, he does not have the type of pain, which would preclude him from performing work as accommodated for in the claimant's residual functional capacity as established above.   He is only mildly limited by his mental impairment.   The claimant has not provided convincing details regarding factors that precipitate the allegedly disabling symptoms.   The claimant's activities of daily living and the medical evidence of record suggest that the claimant can sustain a greater capacity than he described at the hearing or in some of his reports to the state agencies.   Given this evidence, the undersigned concludes the claimant has not satisfied his burden to show he cannot work.   The undersigned finds that neither the severity of his impairments nor the extent of his limitations are supported by the objective medical evidence of record.   Furthermore, the limitations that do exist are adequately accommodated for in the claimant's residual functional capacity as established above.   Because the claimant is not disabled even considering the effects of his alcohol abuse, no separate materiality analysis is required.

Tr. 28.

---

findings, which significantly detract from Dr. Beaty's opinion and support the ALJ's assessment that Plaintiff is not disabled and able to work.   *See supra* at 13-22.

[14]   Dr. Beaty's name is misspelled.   *See* Tr. 269, 271, 368, 401.

The ALJ considered Dr. Beaty's opinions and provided sufficient reasons for assigning them little weight.   Tr. 27.   The ALJ noted Dr. Beaty examined Plaintiff on one occasion, *id.*, and frequency of examination is a factor the ALJ may properly consider in discounting a medical opinion.   *See* 20 C. F. R. § 404.1527(c)(2)(i).   The ALJ indicated Dr. Beaty's assessment was based primarily on Plaintiff's report of subjective symptoms, which he found not reliable.   Tr. 27, 269-71; *see supra* at 25-26. The majority of Dr. Beaty's report consisted of Plaintiff self-reported information, while his evaluation of Plaintiff's mental status constituted a much smaller portion of his report.   Tr. 269-71.

Plaintiff argues that all mental health diagnoses are based on the report of subjective symptoms, suggesting it was not a proper basis upon which to discount Dr. Beaty's opinions.   ECF No. 16 at 8, n.3.   The Eleventh Circuit, however, recently upheld an ALJ's ability to discount a psychiatrist's opinion on the basis that the doctor relied heavily on subjective reports of symptoms and limitations provided by the claimant.   *See* Lacina v. Comm'r of Soc. Sec., F. App'x 520, 527-28 (11th Cir. 2015) (unpublished).   Consistent with Lacina, here, the ALJ explicitly referenced his credibility findings and questioned the reliability of Plaintiff subjective reports.   Tr. 27. Substantial evidence supports the ALJ's determination to discount Dr. Beaty's opinions on the basis that they were based on Plaintiff's reported symptoms.

The ALJ also discounted Dr. Beaty's opinions because they were not consistent with the medical evidence of record, citing the opinions of Plaintiff's providers at MBHC. Tr. 27; see 20 C. F. R. § 404.1527(c) (4).   The ALJ noted Plaintiff saw providers at

MBHC over a period of many months. Tr. 27. The record indicates that Plaintiff was treated at MBHC from January 2011 to December 2011, Tr. 296–337, and from February 2012 to January 2013, Tr. 242–67.

The ALJ noted MBHC providers reported GAF scores in the 50-55 range, which indicated moderate symptoms and limitations of functioning. Tr. 27, 343, 363; *see supra* at n.7; *see also* Tr. 310 (Jan. 21, 2011, GAF score of 65; Mar. 2011 GAF score of 58). The ALJ noted Plaintiff reported to MBHC providers that he enjoyed drawing and spending time with members of his church community and reported good relationships with family and friends. Tr. 26, 313–14. He noted that in March 2012, an MBHC counselor, Mr. Whitley, in response to Plaintiff's report that he had been denied disability benefits and was appealing that decision and his vague description of the specifics of his alleged disabling conditions, indicated that he told Plaintiff that "there are jobs that are not labor-intensive and his depression has been under control for some time with the help of medication." Tr. 26, 342. Mr. Whitley further noted: "[Plaintiff] still refused to look for work continuing to state that he was disabled." Tr. 342.

The ALJ also discounted Dr. Beaty's opinions as they were inconsistent with Plaintiff's ability to perform a good range of daily activities, including using public transportation. Tr. 27; *see* 20 C. F. R. § 404.1527(c)(4). The ALJ noted Plaintiff testified he could perform yardwork, prepare simple meals, wash dishes, vacuum, sweep, mop, make his bed and take out the trash. Tr. 26-27, 41-42. He noted Plaintiff testified he was able to use public transportation and spent time attending church and visiting family and friends, which indicated capacity for social functioning that would not

preclude all sustained work activity.   Tr. 27, 43-45.   Substantial evidence supports the

ALJ's reasons for discounting Dr. Beaty's opinion.   Contrary to Plaintiff's position, the

ALJ complied with Social Security Ruling (SSR) 96–8p, 1996 SSR LEXIS 5 (July 2,

1996) as he explained why Dr. Beaty's opinion was not adopted.

Notwithstanding, Plaintiff argues, citing SSR 85-15, 1985 SSR LEXIS 20 (Jan. 1,

1985) that his mental limitations precluded him from performing the minimal mental

demands of unskilled work, set forth in SSR 96-9P, 1996 SSR LEXIS 6 (July 2, 1996).

ECF No. 16 at 10-11.   As explained above, the ALJ discounted Dr. Beaty's opinion,

citing evidence that Plaintiff social functioning was not as impaired as he alleged, based

on his ability to use public transportation, attend church, and visit with family and

friends.   Tr. 27, 41-45.   Moreover, Dr. Beaty found Plaintiff could understand

instructions, his sustained concentration and task persistence was adequate, and his

memory was not impaired with regard to his history.   Tr. 271.

The ALJ provided multiple reasons, not a single reason, for discounting

Dr. Beaty's opinion.   *Compare* Morrison v. Barnhart, 278 F.Supp. 2d 1331 (M.D. Fla.

2003).   In contrast to the facts set forth in Morrison cited by Plaintiff, which is a

fibromyalgia case, "unique," and inapposite, the ALJ considered Plaintiff's mental

symptoms, not fibromyalgia, and the opinion of a one-time consultative examiner, not a

treating physician.   *Id.* at 1335; *see* ECF No. 16 at 11-12.   Moreover, the ALJ provided

multiple reasons, not a single reason, for discounting Dr. Beaty's opinion.   Tr. 27.

Further, the ALJ's reasons were not general as in Morrison, 278 F. Supp. 2d at 1336, as

they were supported by specific citations to the record.   Tr. 27, 298, 310, 314, 363.

Next, Plaintiff argues that the treatment notes from MBHC supported Dr. Beaty's findings, as they reflected, in part, that he reported auditory hallucinations, described him as sad, and reflected reports that he was sleeping too much and felt hopeless. ECF No. 16 at 12. The ALJ discussed Plaintiff's treatment notes from MBHC. He noted Plaintiff reported improved mood and symptom control with medication compliance. Tr. 26, 298. The ALJ also noted Plaintiff reported no side effects from his medication and that he managed his depression by staying active and trying to remain social. Tr. 26, 298, 319.

The ALJ is charged with weighing the evidence and the Court may not reweigh the evidence or substitute its own judgment for that of the Commissioner even if it finds the evidence preponderates against the Commissioner's decision. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). This Court should not reweigh the evidence and substitute its judgment for the ALJ's judgment.

Finally, Plaintiff argues that the Commissioner is bound to accept the opinion of the consultative psychologist hired by the SSA. ECF No. 16 at 13. The Eleventh Circuit has held, however, that a one-time examiner need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (explaining that ALJ does not have to defer to the opinion of a physician who conducted a single examination, and who was not a treating physician). Substantial evidence supports the weight the ALJ gave to the opinion of Dr. Beaty.

2.

Plaintiff argues that the ALJ incorrectly relied on the vocational expert's testimony

that conflicted with the DOT and "its sister publication the <u>Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles</u> (herein SCO)," rendering invalid his conclusion that jobs existed in significant numbers in the national economy that Plaintiff could perform.[15]   ECF No. 16 at 13-17.

After assessing Plaintiff's RFC, the ALJ determined at step four of the sequential evaluation process that Plaintiff was unable to perform any past relevant work.   Thus, Plaintiff met his burden at this step.   *See* 20 C. F. R. § 404.1520(a)(4)(iv), (f).   The ALJ proceeded to step five to determine if Plaintiff could perform other work.   The burden shifted to the Commissioner at step five to establish that despite Plaintiff's impairments, Plaintiff was able to perform other work in the national economy in light of his RFC, age, education, and work experience.   <u>Phillips v. Barnhart</u>, 357 F.3d at 1237; 20 C.F.R. § 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   <u>Hale v. Bowen</u>, 831 F.2d at 1011.

---

[15]   Plaintiff mentions that "the VE seemed confused with regard to the analysis of "stress" by the [SCO] referring to Tr. 491.   ECF No. 16, at 15.   The record does not include page number 491; the record stops with page 431.   Also, the Foreword to the DOT states, in part:

> As was true of earlier versions, this revised Fourth Edition provides a wide range of occupational information with application to job placement, occupational research, career guidance, labor-market information, curriculum development and long-range job planning.   Data from the 1982 and 1986 DOT Supplements and part of the data from *Selected Characteristics of Occupations Defined in the DOT* are included in and superseded by this revision.

DOT, Foreword.   Plaintiff argues that the vocational expert incorrectly assumed that unskilled jobs are low stress, ECF No. 16 at 16, but cited no persuasive authority for this proposition.   *See supra* at n.2.

Generally, when posing a hypothetical to a vocational expert, the ALJ is required to describe the claimant's educational level, age, work skills, experience, and all of a claimant's impairments included in the RFC.    Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).    The SSA's regulations do not obligate in ALJ to use specific wording when describing a claimant's impairments in these hypothetical so long as the question accurately reflects the claimant's RFC.    For response to a hypothetical question to constitute substantial evidence of work available to the claimant (at step five), the question must set out all of the claimant's impairments.    Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002).    In posing a hypothetical question, the ALJ is not required to include findings the ALJ properly rejects, nor must he accept the vocational expert's responses to hypothetical questions that include unsupported allegations.    Wright v. Comm'r of Soc. Sec., F. App'x 135, 137 (11th Cir. 2009) (unpublished).

If the ALJ determined a claimant has moderate difficulties in concentration, persistence or pace, as here, then the ALJ's hypothetical to a vocational expert must account for those difficulties.    Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180-81 (11th Cir. 2011).    The ALJ need not include, however, such limitations explicitly in the hypothetical.    *Id.* at 1180.    Instead, "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations" in concentration, persistence or pace when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work" despite those limitations.    *Id.*    Hypotheticals also "adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise explicitly account for these limitations."    *Id.*

The ALJ asked the vocational expert a hypothetical question including facts suggesting an individual capable medium exertion work, but further limited by several exertional and non-exertional limitations including, postural limitations, avoidance of environmental factors, who required a "*low stress wor[k] environment with no production line and he needs simple tasks, needs to avoid contact with the public and limited contact with co-workers. By that, I mean he needs to be able to perform his tasks by himself without the need [for assistance] from other co-workers.*" Tr. 56 (emphasis added). The vocational expert opined that Plaintiff could not perform any of his past jobs. *Id.*

The ALJ then asked the vocational expert to assume "down to entry level" positions, that Plaintiff "has most skills, assuming skills at all," "has the work experience, education previously said, and assume further that he can perform medium work and has the exertional and non-exertional limitations I described. Are there any entry-level jobs the claimant could perform, and if so, would you give us the title the job, number of jobs in the region, which is only in the state of Florida? There some non-included light level jobs. Describe those as well." Tr. 57. In response, the vocational expert identified several representative occupations, which the ALJ ultimately found Plaintiff could perform, such as hospital food service worker, sandwich maker, and housekeeping cleaner. Tr. 29; *see supra* at 25-26.

Plaintiff argues that the sandwich maker job requires more contact than anticipated by the hypothetical question.[16] ECF No. 16 at 14-15. The Commissioner

_____

[16] The DOT defines "sandwich maker (hotel & rest.) alternate titles: sandwich-

concedes that the job of sandwich maker, which involves preparing sandwiches to the individual order of customer and does not meet the specifications of the hypothetical question.   ECF No. 17 at 13.   Nevertheless, the Commissioner further argues that the ALJ's reliance on the sandwich maker job identified by the vocational expert was harmless error because the ALJ identified other representative occupations Plaintiff could perform that do not require contact with the public.   *Id.*

Plaintiff argues, however, that the other jobs, hospital food service worker and housekeeping cleaner, also do not meet the limitations of the ALJ's hypothetical question because they require reasoning development levels (R1-R3) and SVP levels (SVP of 2) that exceed the requirements of unskilled work and do not qualify as "low-stress."   ECF No. 16 at 15-18.

The ALJ relied on DOT number 319.677-014 to include hospital food service worker and this DOT number provides:

**319.677-014 FOOD-SERVICE WORKER, HOSPITAL (medical ser.) alternate titles: dietary aide; tray worker**

Prepares and delivers food trays to hospital patients, performing any combination of following duties on tray line: Reads production orders on color-coded menu cards on trays to determine items to place on tray.   Places items, such as eating utensils, napkins, and condiments on trays.   Prepares food items,

---

counter attendant:" "Prepares sandwiches to individual order of customers: Receives sandwich orders from customers.   Slices cold meats and cheese by hand or machine. Selects and cuts bread, such as white, whole wheat, or rye, and toasts or grills bread, according to order.   Places meat or filling and garnish, such as chopped or sliced onion and lettuce, between bread slices.   Prepares garnishes for sandwiches, such as sliced tomatoes and pickles.   May cook, mix, and season ingredients to make dressings, fillings, and spreads.   May fry hamburgers, bacon, steaks, and eggs for hot sandwiches.   May butter bread slices, using knife.   GOE: 05.12.17 STRENGTH: M GED: *R2* M1 L1 *SVP: 2* DLU: 80.*"*   DOT, Occupational Definitions (4th ed., rev. 1991) (emphasis added).

such as sandwiches, salads, soups, and beverages. Places servings in blender to make foods for soft or liquid diets. Apportions and places food servings on plates and trays according to diet list on menu card. Examines filled tray for completeness and places on cart, dumbwaiter, or conveyor belt. Pushes carts to halls or ward kitchen. Serves trays to patients. Collects and stacks dirty dishes on cart and returns cart to kitchen. Washes dishes and cleans work area, tables, cabinets, and ovens. Collects and places garbage and trash in designated containers. May record amount and types of special food items served to patients. May assemble and serve food items to hospital staff in cafeteria. GOE: 09.05.02 STRENGTH: M GED: *R3* M2 L2 *SVP: 2* DLU: 89

DOT, Occupational Definitions (4th ed., rev. 1991) (emphasis added). The vocational expert included "housekeeper cleaner" within the following DOT definition:

**323.687-014 CLEANER, HOUSEKEEPING (any industry) alternate titles: maid**
Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, performing any combination of following duties: Sorts, counts, folds, marks, or carries linens. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies. Checks wraps and renders personal assistance to patrons. Moves furniture, hangs drapes, and rolls carpets. Performs other duties as described under CLEANER (any industry) I Master Title. May be designated according to type of establishment cleaned as Beauty Parlor Cleaner (personal ser.); Motel Cleaner (hotel & rest.); or according to area cleaned as Sleeping Room Cleaner (hotel & rest.). *GOE: 05.12.18 STRENGTH: L GED: R1 M1 L1 SVP: 2 DLU: 86*

DOT, Occupational Definitions (4th ed., rev. 1991) (emphasis added).

Job descriptions in the DOT as noted above include a number of definition trailers that provide supplemental information about the listed jobs. DOT, Occupational Definitions (4th ed., rev. 1991). One of the definitional trailers is General Educational Development (GED) that "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or

college. However, it may be obtained from experience and self-study." *See* DOT,

Appendix C, Components of the Definitional Trailer, § III. The GED Scale is composed

of three divisions, each with six levels: Reasoning Development [designated as R

followed by a level number], Mathematical Development [designated as M followed by a

level number, and Language Development [L followed by a level number]."[17] *Id.* The

scales for each ranges from a low of one to a high of six. *Id.*

Thus, three GED divisions describe the aspects of education an individual would

need to perform a job. An individual's functional limitations cannot be compared to a

GED level because the two are unrelated. Plaintiff, however, tends to use the GED

reasoning level as a statement of the mental demands of the job and claims that he did

not have the reasoning development level to perform the jobs the vocational expert

identified. ECF No. 16 at 15. This comparison appears faulty because there is no

indication that the DOT equates GED levels with the mental demands of a job. Rather,

it states that reasoning level pertains to the education level need to perform the job.

Nevertheless, Plaintiff argues that the ALJ's mental RFC assessment that limited

him to simple tasks performed in a low stress environment means he could only perform

jobs that have a "reasoning level 1." ECF. No. 16 at 15

The vocational expert identified a housekeeping cleaner job that has a reasoning

level of one (R1) and hospital food service worker job, which has a reasoning level of

---

[17] The jobs of sandwich maker and housekeeper cleaner have a language development level of L1 and the hospital food service worker job has a language development level of L2. *See supra* at 40; *see also* DOT, Appendix C, Components of the Definitional Trailer, § III.

three (R3).   Tr. 57.   The DOT defines "reasoning level 1" to mean a worker must

"[a]pply commonsense understanding to carry out simple one-or two-step instructions.

Deal with standardized situations with occasional are no variables in or from these

situations encountered on the job."   DOT, Appendix C, Components of the Definitional

Trailer, § III.   "Reasoning level 3" is defined to mean that a worker must "[a]pply

commonsense understanding to carry out instructions furnished in written, oral, or

diagrammatic form.   Deal with problems involving several concrete variables in or from

standardized situations."   *Id.*

Although there are no decisions cited by Plaintiff that are binding on this Court,

ECF No. 16 at 13-18, the majority of the opinions reviewed by the Court come down on

the side of the Commissioner and have been recently reported by one of our sister

courts in Florida.

> *E.g., Miller v. Comm'r of Soc. Sec.*, 246 F. App'x 660 (11th Cir. 2007)
> (unpublished) (no remand where VE identified even reasoning level three jobs for
> a plaintiff who could do only simple, routine, and repetitive work); *Terry v. Astrue*,
> 580 F.3d 471 (7th Cir. 2009) (even level three reasoning not inconsistent with
> plaintiff's ability to perform only simple work); *Renfrow v. Astrue*, 496 F.3d 918
> (8th Cir. 2007) (reasoning level three not inconsistent with plaintiff's inability to do
> complex work); *Hackett v. Barnhart*, 395 F.3d 1168 (10th Cir. 2005) (stating that
> "level two reasoning appears more consistent with [p]laintiff's RFC" of "simple
> and routine work tasks"); *Lara v. Astrue*, 305 F. App'x 324 (9th Cir. 2008)
> (unpublished) (plaintiff who is able to perform simple repetitive tasks capable of
> doing work at reasoning level two); *Money v. Barnhart*, 91 F. App'x 210 (3d Cir.
> 2004) (unpublished) ("Working at reasoning level 2 would not contradict the
> mandate that [claimant's] work be simple, routine and repetitive."); *Hurtado v.
> Astrue*, No. 09-60930-CIV, 2010 U.S. Dist. LEXIS 44793, 2010 WL 1850261, at
> *11 (S.D. Fla. April 14, 2010) ("Most courts which have addressed this issue
> have held that the requirement of Reasoning Level 2 or 3 is not inconsistent with
> the ability to perform only simple tasks."); *Marley v. Comm'r of Soc. Sec.*, No.
> 8:13-cv-2384-T-CM, 2015 U.S. Dist. LEXIS 23419, 2015 WL 847376, at *4 (M.D.
> Fla. Feb. 26, 2015) (affirming where ALJ found that even a reasoning level of
> three is not necessarily in conflict with the plaintiff's limitation to simple work);

> *Gray v. Colvin*, No. 3:12cv506/EMT, 2014 U.S. Dist. LEXIS 36749, 2014 WL
> 1118105, at *8 (N.D. Fla. Mar. 20, 2014) (finding that "even if Plaintiff has the
> mental RFC to perform only 'simple, routine tasks' and retains the ability to
> understand, remember, and carry out only very short and simple instructions,
> these capacities are consistent with a reasoning level of two or three, not a
> reasoning level of one . . . ."); *Short v. Astrue*, No. 3:11-cv-713-N-BN, 2013 U.S.
> Dist. LEXIS 25387, 2013 WL 655020, at *10 (N.D. Tex. Feb. 5, 2013) (agreeing
> that jobs with a reasoning development level two are consistent with limitations to
> simple instructions and routine tasks); *Davis v. Comm'r of Soc. Sec.*, No. SAG-
> 11-2279, 2013 U.S. Dist. LEXIS 5487, 2013 WL 153594, at *2 (D. Md. Jan. 14,
> 2013) (finding reasoning level two consistent with a restriction to simple, routine
> tasks); *Anderson v. Astrue*, Case No. 2:11-00046, 2011 U.S. Dist. LEXIS 97440,
> 2011 WL 3843683 at *4-5 (S.D. Ala. Aug. 30, 2011) (noting that "several other
> courts have concluded that jobs with a reasoning level of two are consistent with
> simple, unskilled work");*Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984-85 (C.D.
> Cal. 2005) (holding that DOT's level two reasoning requirement did not conflict
> with the ALJ's finding that plaintiff could perform work involving simple, routine
> tasks); *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850 (D. Minn. 2001) (stating that
> "the DOT's level two reasoning requirement did not conflict with the ALJ's
> prescribed limitation" to "simple, routine, concrete, tangible tasks").

Menendez v. Colvin, Case No. 12-21505-CIV-GARBER, 2015 U.S. Dist. LEXIS 35791,

at *10-12 (S.D. Fla. Mar. 23, 2015).

In the instant case, the Court concludes that, even if Plaintiff has the mental RFC

to perform only "simple tasks performed in a low stress environment," these capacities

are consistent with a reasoning level of two or three, not only a reasoning level of one

as argued by Plaintiff.   *See, e.g.*, Gray v. Colvin, 2014 U.S. Dist. LEXIS 36749, at 37-

38 (N.D. Fla. Mar. 20, 2014); *see also* Spiceland v. Colvin, Case No. 1:13-cv-00114-

MP-GRJ, 2013 U.S. Dist. LEXIS 185730, at 28-32 (N.D. Fla. Dec. 27, 2013), *adopted*,

2014 U.S. Dist. LEXIS 28827, at 2-3 (N.D. Fla. Mar. 6, 2014).[18]

---

[18]   In Spiceland, the ALJ found that Plaintiff was moderately limited in
concentration, persistence, and pace.   2013 U.S. Dist. LEXIS 185730, at *31.   The
Court determined that the ALJ's RFC assessment "appropriately accounted for these
limitations by including the non-exertional limitations that Plaintiff was limited to 'simple,

Notwithstanding, as noted above, the vocational expert identified several representative jobs (with the appropriate DOT definitions) that Plaintiff was capable of performing. Plaintiff asked the vocational expert to assume several factors derived from Dr. Beaty's mental RFC assessment. Tr. 58-59. Plaintiff's counsel did not ask the vocational expert to explain how Plaintiff could be expected to perform any of the jobs in light of the DOT definitions and the GED provisions in the DOT. *See* DOT, Appendix C, Components of the Definitional Trailer, § III. In other words, none of the issues now raised by Plaintiff in his memorandum were raised during the hearing. This is acutely problematic here especially when the vocational expert testified without contradiction that her testimony is consistent with the DOT. Tr. 58; *see* Gray v. Colvin, 2014 U.S. Dist. LEXIS 36749, at 38-40 (N.D. Fla. Mar. 20, 2014) and cases cited therein. In this case, there was no apparent conflict for the ALJ to resolve and thus no error.[19] *Id.*

───────────────

repetitive tasks in a low stress environment, . . . limited contact with supervisors, . . . [no] close proximity to co-workers . . . avoid direct contact with the public.' R. 246. Each of these limitations was included in the hypothetical to the VE. R. 501." *Id.* Here, Plaintiff's RFC was "limited to simple tasks performed in a low stress environment" and "must avoid contact with the public and should have only limited contact with coworkers." Tr. 23; *see* Tr. 56-57. Like Spiceland, here, the ALJ's RFC determination and hypothetical to the vocational expert properly accounted for Plaintiff's moderate impairments in concentration, persistence, and pace. *See generally* Jarrett v. Comm'r. of Soc. Sec., 422 F. App'x 869, 872 (11th Cir. 2011) (unpublished). In Spiceland, the identified jobs of assembler of printed products (DOT number 794.687-010) and assembler of plastic hospital products (DOT number 712.687-010) have an SVP of 2 and a reasoning level of two, exertion level of light, whereas the third job, maintenance service dispatcher (DOT number 239.367-014) has an SVP of three and reasoning level of three. Case No. 1:13-cv-00114-MP-GRJ, ECF No. 12-1 at 116 of 156 (Tr. 252). In Spiceland, the Court affirmed the Commissioner's decision. 2014 U.S. Dist. LEXIS 28827, at *2-4 (N.D. Fla. Mar. 6, 2014).

Finally, even if this Court were to determine that both the sandwich maker job and the hospital food service worker job were improperly identified because one requires too much contact with the public and the other's reasoning level exceeds the ability to perform unskilled work, which the Court does not so find, Plaintiff has not established he could not perform the housekeeping cleaner job, with a reasoning level of one and an SVP of two.  Tr. 29, 57.

Substantial evidence supports the ALJ's finding that other work existed in significant numbers (for the three jobs including the housekeeper cleaner job with 10,492 jobs in the state of Florida and 133,887, nationally) in the national economy that

---

[19]    Even if there was an actual or apparent conflict between any part of the vocational expert's testimony and the DOT, in the Eleventh Circuit, the vocational expert's testimony trumps the DOT, notwithstanding the statement in SSR 00-4p, 2000 SSR LEXIS 8, at *5 (Dec. 4, 2000) that "[n]either the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict.   The adjudicator must resolve the conflict by determining .if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information."    *See* Jones v. Apfel, 190 F.3d 1224, 1229-30 (11th Cir. 1994); *see also* Leigh v. Comm'r of Soc. Sec., 496 F. App'x 973, 975 (11th Cir 2012) (unpublished) (citing Jones, 190 F.3d at 1229-30); Hurtado v. Comm'r of Soc. Sec., 425 F. App'x 793, 796 (11th Cir. 2011) (unpublished) (stating "[e]ven assuming that an inconsistency existed between the VE's testimony and the DOT, the ALJ did not err by relying on the VE's testimony because it "trump[ed]" any inconsistent provisions of the DOT.") (citing Jones, 190 F.3d at 1229-30); Jones v. Comm'r of Soc. Sec., 423 F. App'x 936, 939 and n.4 (11th Cir. 2011) (unpublished) ("Social Security Rulings are not binding on this court.   To the extent SSR 00-4p, 2000 SSR LEXIS 8 conflicts with Jones [v. Apfel, 190 F.3d at 1229-30], we are bound by Jones." (internal citations omitted)); Gray v. Colvin, 2014 U.S. Dist. LEXIS 36749, at 40-41 (N.D. Fla. Mar. 20, 2014) and cases cited therein.   SSR 00-4p, 2000 SSR LEXIS 8 only imposes an "affirmative responsibility" on the ALJ to inquire whether any such conflict exists and, if such a conflict exists, obtain a reasonable explanation for it.   If the ALJ inquires as to the existence of a conflict and neither the vocational expert nor plaintiff identifies an apparent conflict or inconsistency, the ALJ has fulfilled his duty under SSR 00-4p, 2000 SSR LEXIS 8.   *See* Leigh, 496 F. App'x at 975.

Plaintiff could perform. Tr. 29, 57; *see* <u>Atha v. Comm'r of Soc. Sec.</u>, 616 F. App'x 931(11th Cir. 2015) (unpublished).

## VI. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are based upon substantial evidence in the record and he correctly followed the law. Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** and judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on November 24, 2015.

<u>s/ Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

### <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**